UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JANE DOE, individually and as next friend of minor T.W., | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 3:15-CV-3811-B |
| DALLAS INDEPENDENT SCHOOL DISTRICT, | § § § § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant's 12(b)(1) and 12(b)(6) Motion to Dismiss Plaintiff's First Amended Original Complaint (Doc. 14). For the reasons that follow, the Court **GRANTS** the Motion.

## I.

## BACKGROUND[1]

This case arises from the alleged sexual harassment and rape of Plaintiff Jane Doe's ("Doe") disabled minor daughter, T.W., by a classmate at Justin F. Kimball High School ("Kimball"), a school in the Dallas Independent School District ("DISD" or the "District"). T.W. suffers from cerebral palsy and static encephalopathy, which has left her severely impaired. Doc. 11, First Am. Compl. ¶¶ 8–10, 12 [hereinafter "FAC"]. In 2013, T.W. began ninth grade at Kimball, where she had a special educational program as a result of her disability, including a class called Functional Life Skills

---

[1] Background facts are drawn from Plaintiff's First Amended Original Complaint (Doc. 11).

("FLS"). *Id.* ¶¶ 7, 11. One of T.W.'s FLS classmates was V.A., a 20-year-old male special needs student. *Id.* ¶ 14. Shortly after the semester began, V.A. began inappropriately touching T.W., including grabbing her buttocks and genital area. *Id.* T.W. reported this behavior to her teacher, Ms. Jones ("Teacher"), but the school took no action. *Id.*

Throughout the fall semester of T.W.'s freshman year, school officials received numerous complaints about V.A.'s behavior. Two girls reported that he had groped them, and a male student complained that V.A. had physically threatened him. *Id.* ¶¶ 15–17. The school responded by separating those students from V.A. *Id.* ¶¶ 15, 17. The administration was also aware that V.A. had previously engaged in sexual misconduct at another school, and that he could not attend classes at the DISD magnet school because of the need to monitor him closely at all times. *Id.* ¶¶ 18–19.

V.A.'s harassment of T.W. continued throughout the semester, and on several occasions he attempted to pull T.W. into the FLS classroom's bathroom.[2] *Id.* ¶¶ 22, 24. V.A. also voiced an interest in "humping"[3] T.W. to another student, who reported it to T.W.'s case manager, Monica Gray ("Gray"). *Id.* ¶ 21. On December 3, 2013, T.W. informed Gray of V.A.'s persistent harassment, including an incident in the lunchroom that day where V.A. hugged and kissed T.W. despite her request to stop. *Id.* ¶ 23. Gray, in turn, relayed these complaints to Vice Principal Waters ("Waters") and Principal Jones ("Principal"), and also attempted to call Doe but was unable to reach her. *Id.* ¶ 25. Additionally, Gray sent a letter home with T.W. regarding the allegations of harassment, which she also provided to Teacher and Waters. *Id.*

---

[2] T.W. reported this behavior to Teacher each time it occurred. Doc. 11, FAC ¶ 24.

[3] Construed by Plaintiff as a term connoting sexual intercourse. Doc. 11, FAC ¶ 21.

Kimball officials responded by holding two meetings about T.W.'s complaints: one on December 3 and one on December 5. *Id.* ¶¶ 25–26. Doe missed the first meeting—attended by Waters, Teacher, Gray, and another teacher—because Gray was unable to reach her that day. *Id.* ¶ 25. Doe, T.W., Waters, Principal, V.A., and V.A.'s parents attended the second meeting. *Id.* ¶ 26. During this meeting, T.W. recounted all the harassment she had endured from V.A., and it came to light that V.A. had previously been removed from Kimball and placed in a private school because of his behavior.[4] *Id.* ¶¶ 26–27. When confronted with the statement about wanting to "hump" T.W., V.A. did not deny making it. *Id.* ¶ 28. None of the school officials disclosed the other complaints they had received about V.A.—Doe found out about these reports from Gray, who had not been allowed to attend the December 5 meeting. *Id.* ¶ 29.

As a result of these meetings, administrators relocated V.A.'s seat to the back of the FLS classroom. He now sat away from T.W., but adjacent to the bathroom that all FLS students were required to use.[5] *Id.* ¶¶ 30–32. No one from Kimball informed Doe that V.A. would sit directly in front of the restroom into which he had previously attempted to pull T.W. *Id.* ¶ 31. Despite this relocation, V.A. continued to touch T.W. inappropriately and try to force her into the restroom for the rest of the semester. *Id.* ¶ 34. Teacher rejected T.W.'s requests to use another bathroom because a school rule required FLS students to use the one in the classroom. *Id.*

After the school's holiday break, V.A.'s harassment resumed and T.W. continued to report these incidents to Teacher. *Id.* ¶ 37. One day in late January 2014, two teacher's aides were

---

[4] V.A. apparently behaved in a sexually inappropriate manner at this private school, as well. *See* Doc. 11, FAC ¶ 27.

[5] This seat location was partially obscured by a half-wall. Doc. 11, FAC ¶ 30.

supervising the classroom because Teacher was attending a meeting.[6] *Id.* When T.W. went to use the restroom, V.A. not only groped her, but followed her into the bathroom and pushed her down on a cot,[7] where he raped her. *Id.* ¶ 38. T.W. did not report the rape until a few weeks later, in part because V.A. had threatened her during the assault. *Id.* ¶¶ 39–40. Doe immediately reported the rape to Kimball's administration, as well as the police and Texas Family and Protective Services ("CPS"). *Id.* ¶ 41. A medical examination revealed evidence of sexual penetration. *Id.* ¶ 44.

In response to Doe's report, school officials held another meeting, which Doe, her husband, T.W., Waters, and Principal attended.[8] *Id.* ¶ 42. At this meeting, T.W. described the rape, and Principal and Waters assured Doe and her husband that they would investigate. *Id.* ¶¶ 42–43. Over the next few weeks, school administrators and CPS questioned T.W. "extensively"—and without her parents' knowledge or permission—about the rape. *Id.* ¶ 45. In addition, one of the teacher's aides who had supervised the class at the time of the rape, Ms. Camacho ("Camacho"), tried several times to convince T.W. that the rape had not happened. *Id.* ¶ 46. Kimball did not suspend V.A. or take any steps to ensure that he did not contact T.W., leading Doe to keep T.W. at home and request that she be transferred to another school.[9] *Id.* ¶ 47.

T.W. eventually changed schools, but by that time had fallen behind in her studies, causing

---

[6] Doe asserts that this violated DISD's rule that two teachers be present in the FLS classroom at all times. Doc. 11, FAC ¶ 37.

[7] Doe alleges that Teacher and Gray were aware that V.A. habitually napped on this cot during the school day. Doc. 11, FAC ¶ 35.

[8] Principal denied Doe's request that Gray be allowed to attend. Doc. 11, FAC ¶ 42.

[9] As a result of this action, Doe was charged with truancy, but it appears that she satisfactorily explained T.W.'s absence. Doc. 11, FAC ¶¶ 48–49.

her grades to suffer. *Id.* ¶¶ 50–51. She has endured "lifelong psychological damages" as a result of the rape and has also lost "educational benefits as a direct result of . . . Defendant's actions." *Id.* ¶ 52. Doe asserts causes of action under Title IX, 20 U.S.C. § 1681, for violating T.W.'s right to educational opportunities and benefits, and 42 U.S.C. § 1983 for (1) interfering with Doe's right to direct T.W.'s upbringing; (2) violating Doe's and T.W.'s rights to familial association; (3) violating T.W.'s right to bodily integrity; (4) failing to protect T.W. from V.A.'s sexual assault; and (5) retaliating against T.W. for exercising her First Amendment right to free speech. *Id.* ¶¶ 54–103. Doe also asserts state law claims for intentional infliction of emotional distress, negligence, and gross negligence. *Id.* ¶¶ 104–107.

DISD moves to dismiss Doe's claims. Doc. 14, Def.'s Mot. to Dismiss. Doe has responded, and DISD has replied. Doc. 15, Pl.'s Resp. in Opp. [hereinafter "Pl.'s Resp."]; Doc. 16, Def.'s Reply Br. in Supp. [hereinafter "Def.'s Reply"]. Doe also requested a hearing on DISD's Motion, which the Court held on June 21, 2016. Doc. 17, Mot. for Hearing; Doc. 18, Elec. Order; Doc. 20, Elec. Order. The Motion is now ready for review.

## II.

## LEGAL STANDARD

A.      *Rule 12(b)(1)—Lack of Subject-Matter Jurisdiction*

At any stage in the litigation, any party may move to dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter-jurisdiction. *King v. Life Sch.*, 809 F. Supp. 2d 572, 576 (N.D. Tex. 2011). "If the court determines at any time that it lacks subject-matter jurisdiction, [it] must dismiss the action." *Id.* (alteration omitted) (quoting Fed. R. Civ. P. 12(h)(3)). This is because "[f]ederal courts are courts of limited jurisdiction," and "without jurisdiction conferred by the

Constitution and statute, they lack the power to adjudicate claims." *Id.* (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). "[T]he burden of establishing federal jurisdiction rests on the party seeking the federal forum." *Id.* (quoting *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001)).

B.      *Rule 12(b)(6)—Failure to State a Claim Upon Which Relief Can Be Granted*

Federal Rule of Civil Procedure 12(b)(6) authorizes a court to dismiss a plaintiff's complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In considering a Rule 12(b)(6) motion to dismiss, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). The Court will "not look beyond the face of the pleadings to determine whether relief should be granted based on the alleged facts." *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999).

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). When well-pleaded facts fail to achieve this plausibility standard, "the complaint has alleged—but it has not shown—that the pleader is entitled to relief."

*Id.* at 679 (internal quotation marks and alterations omitted).

## III.

## ANALYSIS

DISD argues that all of Doe's claims are barred for two reasons. First, she has not exhausted her administrative remedies as required by the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400–1482. Second, she has failed to state claims upon which relief can be granted. The Court will address each of her claims individually.

A.    *Doe's Claims*

Doe has alleged a total of nine claims, which can best be grouped into the following categories: (1) the Title IX claim; (2) the § 1983 claims; and (3) the state law claims. As explained below, none of Doe's claims can survive the District's Motion.

1.    Title IX Claim

Doe brings her first claim under Title IX, alleging that DISD's failure to prevent V.A.'s harassment of T.W. "deprived her of access to the educational opportunities and benefits . . . to which [she] was entitled in violation of 20 U.S.C. § 1681." Doc. 11, FAC ¶¶ 54–64. A school district that receives federal funds can be liable under Title IX where it is deliberately indifferent to known severe student-on-student sexual harassment. *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999). To make out such a claim, a plaintiff must show: (1) the district "had actual knowledge of the harassment"; (2) "the harasser was under the district's control"; (3) "the harassment was based on the victim's sex"; (4) "the harassment was 'so severe, pervasive, and objectively offensive that it effectively bar[red] the victim's access to an educational opportunity or benefit'"; and (5) "the district was deliberately indifferent to the harassment." *Sanches v. Carrollton-*

*Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 165 (5th Cir. 2011) (quoting *Davis*, 526 U.S. at 650).

DISD argues that this claim fails because the IDEA requires Doe to first exhaust her administrative remedies. Doc. 14, Def.'s Mot. to Dismiss 23–25. The fact that Doe has not explicitly alleged a claim under that statute is not conclusive because its exhaustion requirement extends to all claims "seeking relief that is also available under" the IDEA. 20 U.S.C. § 1415(*l*). Thus, a "plaintiff cannot avoid the exhaustion requirements of the IDEA by 'repackaging' the 'claims under some other statute.'" *Ripple v. Marble Falls Indep. Sch. Dist.*, 99 F. Supp. 3d 662, 685 (W.D. Tex. 2015) (quoting *Marc V. v. N. E. Indep. Sch. Dist.*, 455 F. Supp. 2d 577, 592 (W.D. Tex. 2006)). After careful consideration, the Court agrees with the District—Doe's Title IX claim is subject to the IDEA's exhaustion requirement. Because she has not alleged that she complied with this requirement, her claim must be dismissed.

The IDEA "requires states and local educational agencies receiving federal IDEA funds to make a [free appropriate public education (FAPE)] available to children with certain disabilities between the ages of 3 and 21." *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 290 (5th Cir. 2005) (en banc). "The IDEA imposes extensive requirements on schools to safeguard the disabled child's right to a FAPE." *Id.* (citing 20 U.S.C. §§ 1414, 1415). The statute also establishes administrative procedures for resolving complaints "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a [FAPE] to such child." 20 U.S.C. § 1415(b)(6)(A); *see also id.* § 1415(f)–(g) (creating two-step process including initial "impartial due process hearing" by local educational agency and appeal to state educational agency). A complainant must exhaust these procedures before instituting a lawsuit based in some measure on a school district's failure to provide a FAPE. *Id.* § 1415(*l*); *Gardner v. Sch. Bd. Caddo Parish*, 958 F.2d

108, 111 (5th Cir. 1992). Doe has not alleged that she availed herself of the available administrative processes, nor does she argue that such exhaustion would have been futile. *See Honig v. Doe*, 484 U.S. 305, 327 (1988) ("[P]arents may bypass the administrative process where exhaustion would be futile or inadequate."). Therefore, if her Title IX claim "seek[s] relief that is also available under" the IDEA, then it cannot proceed.

Not every "injury a disabled student suffers in school is automatically subject to the IDEA." *Pagan-Negron v. Seguin Indep. Sch. Dist.*, 974 F. Supp. 2d 1020, 1028 (W.D. Tex. 2013). Indeed, where a plaintiff "does not allege deprivation of certain educational services" or "seek remedies that are educational in nature," the IDEA does not apply. *Id.* Unfortunately for Doe, this is exactly the type of claim that she has brought: the Title IX cause of action is based on sexual harassment "so severe, pervasive, and objectively offensive that it can be said to *deprive the victim*[] *of access to the educational opportunities or benefits provided by the school.*" *Davis*, 526 U.S. at 650 (emphasis added).[10] The fact that she has nominally requested money damages does not change this conclusion—the substance of a claim rather than the form of relief sought determines whether exhaustion is required. *See Doe v. S & S Consol. I.S.D.*, 149 F. Supp. 2d 274, 304 (E.D. Tex. 2001). Consequently, the Court is constrained to conclude that the IDEA obligates Doe to exhaust administrative remedies. Since there is no indication that she has done so, her Title IX claim fails.

---

[10] To support her claim, Doe alleges that the harassment (including the rape) caused T.W. to suffer academically. Doc. 11, FAC ¶ 51 ("T.W.'s school records . . . reflect that after the rape, she was struggling with her grades, receiving unsatisfactory marks in the subjects of writing, science, and social studies/history, and did not meet the statewide assessment performance standard for science and social studies/history."). She also complains that T.W. "never received any tutoring or counseling from the school to compensate for these losses." *Id.* ¶ 50.

2.    Section 1983 Claims

Doe also seeks relief under 42 U.S.C. § 1983 for putative violations of T.W.'s First[11] and

Fourteenth Amendment rights, as well as Doe's own Fourteenth Amendment rights. Doc. 11, FAC

¶¶ 65–103. DISD challenges these claims, arguing that they are both subject to IDEA exhaustion

and inadequately pleaded. Doc. 14, Def.'s Mot. to Dismiss 2–18, 23–25. Even assuming that Doe was

not required to exhaust administrative remedies for these claims, her allegations are not sufficient

to avoid dismissal.

i.    *Doe's right to direct T.W.'s upbringing (Fourteenth Amendment)*

Doe alleges that DISD, through Principal and Waters, violated her right to direct T.W.'s

upbringing by moving V.A.'s seat next to the bathroom without informing her.[12] Doc. 11, FAC ¶ 76.

She states that DISD is liable both directly, because it failed to train its officers to respond to sexual

assaults against students, and indirectly, because it delegated policy-making authority to Principal.

*Id.* ¶ 77. Last, Doe alleges that Kimball officials' (1) failure to enforce the two teachers rule, and

(2) enforcement of the bathroom rule demonstrated their deliberate indifference to Doe's right to

direct her child's upbringing. *Id.* ¶ 78. None of these allegations, however, suffice to establish a

---

[11] The First Amendment does not apply directly to the states, but rather has been incorporated through the Fourteenth Amendment Due Process Clause. *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 489 n.1 (1996). So Doe's First Amendment claim is really a Fourteenth Amendment claim. For the sake of clarity, however, the Court will refer to Doe's claims as her "First Amendment" and "Fourteenth Amendment" claims.

[12] Doe also alleges that Principal and Waters "condoned and ratified . . . Comacho's efforts to . . . coerce T.W. into saying the rape did not occur." Doc. 11, FAC ¶ 76. But she has not explained how they did so, making this allegation conclusory and unsupported. Accordingly, the Court will disregard it in deciding this Motion.

violation of Doe's constitutional right, nor can they sustain a claim for municipal liability against the District.

> a.   No Violation of Doe's Constitutional Right

Parents have a "fundamental liberty interest" "in the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). In a public school context, however, "parental rights are not absolute . . . and can be subject to reasonable regulation." *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 291 (5th Cir. 2001). Thus, "parents simply do not have a constitutional right to control each and every aspect of their children's education and oust the state's authority over that subject." *Id.* (quoting *Swanson v. Guthrie Indep. Sch. Dist.*, 135 F.3d 694, 698 (10th Cir. 1998)). Instead, the "rational-basis test is the appropriate level of scrutiny for parental rights in the public school context." *Id.* Only the denial of a parent's ability to make fundamental decisions regarding her child's education rises to the level of a constitutional violation. *See Meadows v. Lake Travis Indep. Sch. Dist.*, 397 F. App'x 1, 3 (5th Cir. 2010) (unpublished) (per curiam).

Here, Doe complains that (1) the school did not inform her that it was moving V.A.'s seat next to the bathroom, (2) Teacher required T.W. to use that bathroom, and (3) the school did not enforce its two teachers in the classroom rule. These actions survive the rational-basis test. The officials' decision to move V.A.'s seat away from T.W.'s is rationally related to the legitimate state goal of protecting T.W., and the bathroom rule—which keeps students in the classroom—is rationally related to the state's legitimate interest in supervising the students. Last, the two teachers rule is the school's own policy rather than a constitutional obligation, and none of Doe's allegations show that relying on two teacher's aides to supervise the class was irrational. Accordingly, each action about which Doe complains was a reasonable regulation of her parental right.

Doe disagrees, arguing that she has stated a claim for interference with her parental right under *Troxel* and *Pierce v. Society of the Sisters of the Holy Names of Jesus and Mary*, 268 U.S. 510 (1925). Doc. 15, Pl.'s Resp. 11–12. But those cases differ significantly from the one at bar, and neither undermines *Littlefield*'s conclusion that a parent's right is considerably circumscribed when it comes to public school education. In *Troxel*, the Supreme Court invalidated a state statute that allowed a judge to override a fit parent's decision regarding visitation "based solely on the judge's determination of the child's best interests." 530 U.S. at 67. The law violated the mother's due process right because it gave *any* third party a legal means to compel access to her children. *Id.* Thus, *Troxel* did not occur within the context of a public school and involved a more significant encroachment on the parental right.

*Pierce*, on the other hand, did relate to public schooling, but involved a more sweeping regulation than the ones about which Doe complains. The challenged law mandated public school attendance for children between the ages of eight and sixteen who had not completed the eighth grade, with certain narrow exceptions. *Pierce*, 268 U.S. at 530–31. The Supreme Court concluded that the law interfered with parents' right to "direct the upbringing and education of children under their control," insofar as it forced parents to send their children to public school. *Id.* at 534–35. But this does not help Doe, as the right to choose what sort of school a child will attend and the right to have input on seating arrangements or bathroom policies are cut from different cloth. The former is almost self-evidently a fundamental decision about the child's education, while the latter is, at best, a "component of the educational process" that Doe is attempting to "mask . . . with the trappings of a fundamental right and then elevate . . . to the status of a fundamental right." *Jeffrey v. Bd. of Trustees of Bells ISD*, 261 F. Supp. 2d 719, 727 (E.D. Tex. 2003). A public school may

constitutionally regulate such components without impinging on a parent's right to control her child's upbringing, so Doe has failed to state a claim for the violation of her constitutional right.

### b. Municipal Liability

Doe's allegations do not make out a claim for municipal liability, either. To hold a municipal entity such as DISD liable for constitutional violations committed by municipal officers, a plaintiff must prove three elements: (1) "a policymaker"; (2) "an official policy"; and (3) "a violation of constitutional rights whose moving force is the policy or custom." *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 166 (5th Cir. 2010). Doe falters on all three elements.

### 1. POLICYMAKER

Here, Doe alleges that DISD is liable because (1) it failed to train its officials, and (2) it delegated final policymaking authority to Principal. Doc. 11, FAC ¶¶ 77–78. State law determines whether a municipal official is a final policymaker for purposes of § 1983 liability. *Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989). Under Texas law, the trustees of an independent school district "have the exclusive power and duty to govern and oversee the management of the public schools of the district." Tex. Educ. Code § 11.151(b). Accordingly, DISD's Board of Trustees (the "Board") is a final policymaker, so Doe's first theory of liability survives this element. As for her second, Doe alleges that the Board delegated its authority to Principal, but she provides no factual support for that assertion. Without more, the Court "would not be justified in assuming that municipal policymaking authority lies somewhere other than where the applicable law purports to put it." *Rivera v. Hous. Indep. Sch. Dist.*, 349 F.3d 244, 248 (5th Cir. 2003) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988)). Thus, Doe's second theory of liability fails because she cannot show that Principal was a final policymaker.

2.    OFFICIAL POLICY

"In a § 1983 claim for failure to supervise or train, the plaintiff must show that: '(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference.'" *Goodman v. Harris Cty.*, 571 F.3d 388, 395 (5th Cir. 2009) (quoting *Smith v. Brenoettsy*, 158 F.3d 908, 911–12 (5th Cir. 1998)). A successful failure to train claim also requires the plaintiff to "allege with specificity how a particular training program is defective." *Zarnow*, 614 F.3d at 170 (quoting *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005)). Here, Doe has not identified what training program DISD provided that was ineffective. She has only alleged that the training, whatever it was, should have included:

> [R]equirements for written documentation and expedited reporting to administration of complaints of sexual harassment, provision for the timely reporting of complaints, immediate segregation of the victim of the sexual harassment and the abuser[, and] guidelines for the timely investigation of complaints or resolution thereof as well as disciplinary action to be taken.[13]

Doc. 11, FAC ¶ 77. But without knowing what training DISD provided, it is impossible to know whether the failure in this case lies in the training or the officials' execution. As a result, her failure to train theory also falls short.

In addition to the failure to train claim, Doe alleges that DISD had a policy or custom of not enforcing the two teachers rule, and that this failure manifests deliberate indifference because of widespread sexual abuse of students, especially special needs students. *Id.* ¶ 78. There are two kinds

---

[13] These shortcomings seem to track Doe's criticism of how officials handled T.W.'s case. Taken with her failure to identify a particular DISD training program, it appears that she may be attempting to cast the officials' perceived missteps as training inadequacies.

- 14 -

of "official policies": (1) "a policy statement formally announced by an official policymaker," and (2) a "persistent widespread practice of . . . officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Zarnow*, 614 F.3d at 168–69 (quoting *Webster v. City of Hous.*, 735 F.2d 838, 841 (5th Cir. 1984)). To show that a custom or policy exists, a plaintiff must show either "a pattern of unconstitutional conduct . . . on the part of municipal actors or employees," or that "a final policymaker took a single unconstitutional action." *Id.* at 169 (emphasis omitted).

Doe has not identified a formal policy statement from DISD, and as explained, Principal was not a final policymaker. Thus, she must show a "persistent widespread practice" that is "so common" as to "fairly represent municipal policy." *Id.* at 168–69. She has not done so. The only incident she has identified where Kimball (or any school in the district, for that matter) did not enforce the rule[14] is the day T.W. was raped. No factual allegations substantiate her conclusory statements regarding the supposedly rampant sexual abuse at schools, and she has not tied any of these unspecified events to a failure to enforce the two teachers rule. As a result, she has not satisfactorily alleged an official policy underlying any deprivation of her constitutional right.

### 3.   MOVING FORCE

Last, Doe must show "a violation of constitutional rights whose moving force is the policy or custom." *Zarnow*, 614 F.3d at 166. As explained above, however, she has alleged neither a constitutional violation nor an official policy or custom. Therefore, she has not alleged this element

---

[14] It is not self-evident that Kimball in fact failed to apply its rule, as two teacher's aides were present in the classroom at the time of T.W.'s rape. But even assuming that this was a violation, Doe has still failed to show an official custom of not enforcing the rule.

either, so her municipal liability claim must fail.

        ii.     *Doe's and T.W.'s rights to familial association (Fourteenth Amendment)*

      This claim is based on virtually identical allegations as the previous claim, only this time Doe alleges that DISD's actions, through the school officials, "interfered with [T.W.'s] ability to maintain an emotional bond with her mother," violating their rights to familial association. Doc. 11, FAC ¶ 82. As with her upbringing claim, these allegations do not make out a violation of Doe's (or T.W.'s) right to familial association.

      The right to familial association or family integrity "is a form of liberty guaranteed by the due process clause of the Fourteenth Amendment." *Morris v. Dearborne*, 181 F.3d 657, 667 (5th Cir. 1999). Although this right is "nebulous and undefined," *Rolen v. City of Brownfield, Tex.*, 182 F. App'x 362, 364 (5th Cir. 2006) (unpublished) (per curiam), it is best described as "the right of the family to remain together without the coercive interference of the awesome power of the state." *Morris*, 181 F.3d at 667 (quoting *Hodorowski v. Ray*, 844 F.2d 1210, 1216 (5th Cir. 1988)). Correspondingly, it applies primarily in cases where state action (or inaction) physically separates family members from one another. *See, e.g., id.* at 664; *Ruiz v. Tex. Dep't of Protective & Regulatory Servs.*, 984 F. Supp. 2d 657, 661–64, 672–73 (S.D. Tex. 2013). This Court also recently concluded that "only 'state action that purposefully interfere[s] with the family relationship'" rises to the level of a due process violation. *Dyer v. City of Mesquite*, No. 3:15-CV-2638, 2016 WL 2346740, at *6 (N.D. Tex. May 3, 2016) (emphasis omitted) (quoting *Russ v. Watts*, 414 F.3d 783, 790 (7th Cir. 2005)).

      Here, Doe has not alleged that DISD's actions worked any sort of physical separation between her and her daughter. Also, she has not cited any support for the proposition that state action,

without any physical separation, violates this right. In fact, the two cases Doe cites actually undermine her position. *Vidovic v. Mentor City School District*, 921 F. Supp. 2d 775 (N.D. Ohio 2013), concerned a bullied high school student who committed suicide, and the court found that there had been no violation of the right to family integrity because the deprivation was "caused by the alleged actions of third party individuals" rather than school officials. *Id.* at 793. Similarly, in *Coleman v. Utah State Charter School Board*, No. 2:10-CV-1186, 2011 WL 4527421 (D. Utah Sept. 28, 2011), the court held that a state licensing authority had not violated a mother's right by requiring that she be removed as the director of her children's school and denied physical access thereto. *Id.* at *5. So even a physical separation, standing alone, is insufficient to establish a constitutional violation. Doe has also not alleged that the Kimball officials acted with the purpose of interfering with the family relationship. Consequently, she has failed to state a claim for a violation of the right to family integrity.

Quite simply, Doe has not explained how Kimball's actions in moving V.A. next to the bathroom that T.W. had to use or failing to enforce its two teachers rule interfered with her ability to keep her family together. As well, she has failed to state a claim for municipal liability for the same reasons stated above regarding her upbringing claim.

       iii.     *T.W.'s right to bodily integrity and DISD's failure to protect (Fourteenth Amendment)*

This section addresses three separate claims: (1) T.W.'s right to bodily integrity and freedom from state-occasioned harm; (2) DISD's duty to protect T.W. as a result of their special relationship; and (3) DISD's duty to protect T.W. as a result of placing her in state-created danger. The latter two are exceptions to the general rule that a state owes no affirmative constitutional duty to protect

against the actions of private individuals, so they are best treated as a unitary failure to protect claim. Additionally, Doe has not alleged that a state actor inflicted bodily harm on T.W., but rather that a private actor (i.e., V.A.) did. Thus, this claim also devolves into one for failure to protect. Therefore, the Court will analyze these claims together.

It is undisputed that all of the harassment, including the rape, was committed by a private individual rather than a state actor. Doe contends, however, that a state actor can still be held liable for a private party's molestation of a child when the abuse occurs as the result of a deliberately indifferent supervisory failure. Doc. 15, Pl.'s Resp. 14. For support, Doe relies on *Doe v. Taylor Independent School District*, 15 F.3d 443 (5th Cir. 1994), where the Fifth Circuit stated: "school officials can be held liable for supervisory failures that result in the molestation of a schoolchild if those failures manifest a deliberate indifference to the constitutional rights of that child." *Id.* at 445. But this holding came in the context of a teacher's sexual assault of a student and was based on the municipality's "broad obligation to supervise all of its employees." *Id.* at 453. Doe has pointed to no corresponding duty to supervise the rights of private actors; indeed, such a duty would be inconsistent with the rule that "the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989). Doe alleges that two exceptions to this rule apply here: the special relationship exception, and the state-created danger exception. Doc. 11, FAC ¶¶ 94–103; Doc. 15, Pl.'s Resp. 14–16.

a.      Special Relationship

The Supreme Court explicitly identified one exception to the general rule in *DeShaney*: a

state owes an affirmative duty of care to individuals with whom it has a "special relationship." *DeShaney*, 489 U.S. at 197–98. This relationship exists where the state "takes a person into its custody and holds him there against his will." *Id.* at 199–200. Thus, the state owes a "duty to assume some responsibility for [the] safety and general well-being" of prisoners, involuntarily committed mental patients, and, in the Fifth Circuit, children placed in foster care. *Id.* at 198–200; *Doe ex rel. Magee v. Covington Cty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 856 (5th Cir. 2012).

Obviously, none of these exceptions apply to this case. Moreover, the Fifth Circuit has regularly held that "a public school does not have a *DeShaney* special relationship with its students requiring the school to ensure the students' safety from private actors." *Covington Cty.*, 675 F.3d at 857. Doe argues that DISD entered into a special relationship with T.W. when it required her to use only the restroom to which her harasser sat adjacent, effectively creating a custodial situation. Doc. 15, Pl.'s Resp. 16. But requiring a student to use a particular restroom is no more custodial than requiring her to attend school in the first place. The latter compulsion does not create a special relationship, so the Court will not read the former to create one, either. *See Doe v. Hillsboro Indep. Sch. Dist.*, 113 F.3d 1412, 1415 (5th Cir. 1997).

The case Doe cites, *Dorothy J. v. Little Rock School District*, 7 F.3d 729 (8th Cir. 1993), does not help her. There, the Eighth Circuit found that compulsory education laws did not create a special relationship between a student and his public school because "[p]ublic school attendance does not render a child's guardians unable to care for the child's basic needs." *Id.* at 732. This was true even though the child was a special needs student, since the state had not placed the student involuntarily in the special needs program where he was sexually assaulted. *Id.* A special relationship only arises "when the State by the affirmative exercise of its power so restrains an individual's liberty that it

renders him unable to care for himself, and at the same time fails to provide for his basic human needs." *Id.* (quoting *DeShaney*, 489 U.S. at 200). Requiring T.W. to use a particular restroom does not rise to that level. Thus, DISD did not have a special relationship with T.W.

b.      State-Created Danger

Doe also argues that DISD owed T.W. a duty of care because it created a dangerous situation by forcing her to use a bathroom right next to her harasser, when it knew that he had tried to force her into that very same bathroom several times before. Doc. 11, FAC ¶¶ 95–97; Doc. 15, Pl.'s Resp. 14–15. The Court disagrees.

Several circuits have recognized the state-created danger exception, based on the following language in *DeShaney*:

> While the State may have been aware of the dangers that [the child] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them. That the State once took temporary custody of [the child] does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all.

489 U.S. at 201; *see also Covington Cty.*, 675 F.3d at 863 n.8 (collecting cases). Under this theory, "a state actor may be liable under § 1983 if the state actor created or knew of a dangerous situation and affirmatively placed the plaintiff in that situation." *Covington Cty.*, 675 F.3d at 864. According to Doe, school officials knew from Gray's reports and the December 5, 2013, meeting that V.A. had tried to force T.W. into the restroom; thus, seating him next to the bathroom and forcing T.W. to use it affirmatively placed her in a known dangerous situation. Doc. 11, FAC ¶ 96.

The Fifth Circuit has never recognized the state-created danger exception. In fact, it has

repeatedly declined to adopt it.[15] *Covington Cty.*, 675 F.3d at 864–65. Despite most circuits' decisions to the contrary, there is a strong textual reason for reticence. In *DeShaney*, where the exception supposedly originated, the Supreme Court announced its general no-duty rule, and explicitly identified an exception for "when the State takes a person into its custody and holds him there against his will" (i.e., the special relationship exception). 489 U.S. at 199–200. The Court also stressed the narrow nature of this exception. *Id.* at 198–200. It did not explicitly identify state-created danger as a second exception, and the language that other courts have relied on appears in a paragraph explaining why the state did not have a special relationship with someone it once held in its custody after that person had been released. *Id.* at 201. In light of the fact that the court expressly identified one narrow exception to a broad no-duty rule, it seems tenuous at best to infer a second from two sentences of text explaining why the explicit exception did not apply.

All that being said, the text does imply that whether the state created a danger or rendered someone more vulnerable to it is somehow relevant. But even if the Court assumes without deciding that the state-created danger exception does exist, Doe has not invoked it as to DISD because she relies on the same delegated authority and failure to train allegations that the Court has already rejected. *See* Doc. 11, FAC ¶¶ 68–73. As a result, she has not sufficiently pleaded that DISD's policy, rather than Kimball officials' actions, placed T.W. in danger. Her claim must be dismissed.

  *iv.*  *Retaliation (First Amendment)*

Doe's final § 1983 claim is a First Amendment retaliation claim, in which she alleges that DISD, through Camacho, "retaliated against [T.W.] by engaging in a pattern over the course of

---

[15] In *Breen v. Texas A&M University*, 494 F.3d 516, 518 (5th Cir. 2007) (mem. op.), the court withdrew part of an opinion recognizing the state-created danger exception.

several weeks of attempting to cover up the rape by trying to coerce [T.W.] . . . into saying that 'nothing happened' to her." Doc. 11, FAC ¶ 89.  To prove her retaliation claim, Doe must show: (1) T.W. was "engaged in constitutionally protected activity"; (2) DISD's "actions caused [her] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity"; and (3) DISD's "adverse actions were substantially motivated against [T.W.'s] exercise of constitutionally protected conduct." *Keenan v. Tejada*, 290 F.3d 252, 258 (5th Cir. 2002).

Even assuming that Comacho's alleged actions satisfy these elements, this claim is a quintessential example of trying to hold a municipality liable on a *respondeat superior* basis, which is not permitted. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978). All alleged retaliation was committed by a teacher's aide, whose only relationship to DISD is that she was a Kimball employee. Doe has not identified a District policy that was the moving force behind any constitutional violation that Comacho may have committed, other than to again recite the same failure to train and failure to enforce the two teachers rule allegations discussed above. Doc. 11, FAC ¶¶ 92–93. There is simply no basis in the Amended Complaint for holding DISD liable for the actions of a lone employee. Thus, Doe's retaliation claim fails.

3.    <u>State Law Claims</u>

Doe has also included claims for negligence, gross negligence, and intentional infliction of emotional distress against DISD. *Id.* ¶¶ 104–07. As the District points out, however, it is immune from all tort claims not involving the operation of a motor vehicle. Tex. Civ. Prac. & Rem. Code § 101.051; *Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 655–56 (Tex. 2008). Doe has not responded to DISD's arguments for dismissal of these claims, and it does not appear that she can do so in a way that overcomes the District's immunity. Accordingly, the Court dismisses Doe's state

law claims, as well.

B.      *Leave to Amend*

Normally, courts will afford a plaintiff the opportunity to overcome pleading deficiencies, unless it appears that the defects are incurable. *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable . . . ."). But permitting multiple attempts at re-pleading is not an absolute requirement. There are limitations on repeated attempts at amendments, particularly where a court concludes that a plaintiff has already had an opportunity to state her best case and her pleadings still fall short. *See Schiller v. Physicians Res. Grp. Inc.*, 342 F.3d 563, 567 (5th Cir. 2003).

Here, Doe has already availed herself of one opportunity to amend her complaint, and yet her claims still suffer from the same fatal defects already identified in DISD's first motion to dismiss. *See* Doc. 10, Def.'s 12(b)(1) and 12(b)(6) Mot. to Dismiss. She does not appear to have exhausted her Title IX claim, none of her otherwise detailed allegations have identified any of the necessary factual predicates for a municipal liability claim, and DISD's immunity bars her state law claims. Doe also had a full opportunity to further articulate the factual support for her claims at the hearing, and was encouraged by the Court to do so, but offered little more than what already appears in her First Amended Complaint. Given these chances to flesh out her allegations, Doe has "had fair opportunity to make h[er] case," and her failure to do so justifies dismissing this action. *Schiller*, 342 F.3d at 567.

## IV.

## CONCLUSION

Based on the foregoing, the Court **GRANTS** DISD's Motion to Dismiss Plaintiff's First

Amended Original Complaint (Doc. 14).


**SO ORDERED.**

**SIGNED:** July 11, 2016.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE